# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **VILMARIE RAMOS-BIROLA,**  ) | |
| ) | |
| **Plaintiff,**  ) | |
| ) | |
| **v.**  ) | **Civil Action No. 10-12275-DJC** |
| ) | |
| **MICHAEL J ASTRUE, Commissioner,**  ) | |
| **Social Security Administration,**  ) | |
| ) | |
| **Defendant.**  ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                               September 24, 2012

## I.    Introduction

Plaintiff Vilmarie Ramos-Birola ("Ramos-Birola") brings this action for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") and affirmed by the Decision Review Board ("the Board"), denying her claim for disability insurance benefits ("SSDI") and supplemental security income ("SSI").   Before the Court are Ramos-Birola's Motion to Reverse or Remand and the Commissioner's Motion to Affirm that decision. In her motion, Ramos-Birola claims that the ALJ erred in denying her claim because the ALJ: (1) found that Ramos-Birola's fibromyalgia did not amount to a medically determinable impairment; (2) found that Ramos-Birola was not severely impaired by Carpal Tunnel Syndrome ("CTS"); (3) ascribed limited credibility to Ramos-Birola's statements about the intensity, persistence, and limiting effects of her symptoms; (4) did not grant greater weight to the opinions of Ramos-Birola's treating physicians than to the opinions of non-treating physicians; (5) did not

explicitly consider the opinion of Ramos-Birola's primary care physician that Ramos-Birola would need to be absent from work more than three times per month due to her impairments; and (6) did not refer to the reports of Ramos-Birola's mental health professionals to assess her physical condition. For the reasons discussed below, the Commissioner's motion is DENIED, Ramos-Birola's motion is GRANTED and the decision of the Commissioner is REMANDED.

## II.     Factual Background

Ramos-Birola was 35 years old when she ceased working on April 1, 2009.  See R. 150. She had previously worked as a production assembler, clothes washer, general helper and clothes folder. R. 16–17.  In her April 2009, July 2009 and January 2010 requests for SSDI and SSI with the SSA, she alleged disabilities due to back problems, spondyloarthritis, lumbar spinal stenosis, fibromyalgia, depression, neck pain and hand nerve issues.  R. 167, 203, 245.

## III.    Procedural Background

Ramos-Birola filed claims for SSDI and SSI with the Social Security Administration ("SSA") on April 14, 2009, asserting that she was unable to work as of April 1, 2009.  R. 154. After initial review, her claims were denied on July 24, 2009, R. 112–15, and they were denied upon reconsideration on January 4, 2010, R. 118–20.  On January 14, 2010, Ramos-Birola filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 122.   An ALJ conducted the hearing on July 26, 2010. R. 7. In a written decision dated August 9, 2010, the ALJ found that Ramos-Birola does not have a disability within the definition of the Social Security Act and denied Ramos-Birola's claims.  R. 18.  The ALJ also notified Ramos-Birola that the SSA's Decision Review Board selected her claim for review.  R. 4.  The Board issued its decision on November 8, 2010.  R. 1.  The Board affirmed the ALJ's determination that Ramos-Birola is not disabled.  R. 1.

**IV.**     **Discussion**

**A.  Legal Standards**

**1.   Entitlement to Disability Benefits and Supplemental Security Income**

To receive SSDI and SSI benefits, a claimant must demonstrate that he or she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505.   The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.   20 C.F.R. § 416.920.   The determination may be concluded at any step in the process.   Id.   First, if the applicant is engaged in substantial gainful work activity, then the application is denied.   Id.   Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.   Id.   Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.   Id.   Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied.   Id.   Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted.   Id.

### 2.   Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard.  See Manso-Pizarro, 76 F.3d at 16; 42 U.S.C. § 405(g).

### B.   Before the ALJ

### 1.   Medical History

There was extensive evidence before the ALJ about Ramos-Birola's medical history, particularly in regard to the conditions upon which Ramos-Birola relied in her application for SSDI and SSI benefits. Ramos-Birola said she suffered from back problems, spondyloarthritis, lumbar spinal stenosis, fibromyalgia, depression, neck pain and hand nerve issues.  See R. 167, 203, 245.  The ALJ also noted the additional possible impairments of obesity and osteoarthritis of the knee in her decision. R. 9.

### a.   Back and Neck Disorders

#### i.   Dr. Harry Katz-Pollak (Primary Care Physician)

On March 4, 2009, Ramos-Birola reported to her primary care physician, Dr. Harry Katz-Pollak, that she had pain, weakness and numbness radiating from her lower back down into her legs.  R. 554.  It appears that Dr. Katz-Pollak prescribed Robaxin and recommended that Ramos-Birola not work for the next week.  R. 554.  An x-ray, performed the same day, showed that Ramos-Birola's "spine appears to be normal."  R. 286.  At a follow-up appointment on March 11, Ramos-Birola reported the same symptoms with even worse pain and Dr. Katz-Pollak ordered an MRI.  R. 553.  The results of that MRI showed "mild degenerative change" but "no lateralizing disc extrusion or limiting stenosis."  R. 287–88.  On April 1, 2009, during follow up for her MRI, Dr. Katz-Pollack recommended that she see an orthopedic specialist.  R. 552.  Upon Ramos-Birola's request, Dr. Katz-Pollak wrote a short note saying Ramos-Birola could not work due to severe spondyloarthritis and LSS (i.e., lumbar spinal stenosis).  R. 312.

On April 13, 2009, Ramos-Birola returned to Dr. Katz-Pollak reporting continued diffuse neck, shoulder and back pain.  R. 549.  Dr. Katz-Pollak noted prescriptions for Flexeril, Tramadol and Diclofenac.  R. 549.  He also ordered a bone scan.  R. 549.  The bone scan showed that there was "a small focus of increased radiotracer activity in the area of the right wrist" but that the exam was "otherwise unremarkable."  R. 295.  Ramos-Birola returned to Dr. Katz-Pollak on April 29, 2009 complaining of insomnia and neck pain.  R. 548.  He recommended continued consultation by orthopedic specialists.  R. 548.  On May 11, 2009, Ramos-Birola returned again complaining of back pain and Dr. Katz-Pollak recommended that she consult a rheumatologist.  R. 546.

### ii. Dr. Cornelissen (Orthopedic Specialist)

On April 10, 2009, Ramos-Birola met with Dr. Simon Cornelissen, an orthopedic specialist. R. 396. Dr. Cornelissen discontinued prescriptions of methocarbamol and indomethacin and prescribed Tramadol and Diclofenac. R. 396. He ordered an MRI and prescribed physical therapy. Id. The MRI showed "[n]o evidence of focal disk protrusion" but "[s]ome evidence of facet joint irritation." R. 445. After an initial physical therapy evaluation on April 22, 2009, R. 482–84, Dr. Cornelissen met with Ramos-Birola on May 1 to follow up on her MRI. R. 283. He recommended that she continue physical therapy. R. 283. Ramos-Birola began her physical therapy sessions in late April 2009. R. 480. She continued for eleven sessions, ending on June 12, 2009, after which was she discharged from physical therapy. R. 476–80.

On June 26, 2009, Ramos-Birola reported diffuse pain, covering the entire spine and said that the physical therapy had not helped. R. 421. Dr. Cornelissen assessed her with "chronic low back pain" and "possible fibromyalgia." R. 421. He recommended a treatment plan as follows: "I think she will benefit most, from an orthopedic perspective, from a long-term program of physical therapy and strengthening and range of motion. I do not think that she will benefit from any interventional treatment at this point." R. 421.

On September 15, 2009, Ramos-Birola reported that she had back pain that was shooting down her legs. R. 352. Dr. Cornelissen assessed her with "probable lumbar radiculopathy" and ordered an MRI. R. 352. The impression of the physician who interpreted the MRI was that it was a "negative study." R. 433. On October 13, 2009, Dr. Cornelissen met with Ramos-Birola to discuss the results of this MRI. R. 514. He recommended that she "work with physical therapy for this most likely represents muscular strain with continued spasm." R. 514. He also

noted, "She does have a history of fibromyalgia which may be contributed [sic] to her symptoms also." R. 514.

Ramos-Birola saw Dr. Cornelissen about her history of neck pain radiating into her arm on December 4, 2009. R. 512. Dr. Cornelissen ordered an MRI to investigate possible cervical radiculopathy. R. 512. The MRI showed a small disk protrusion. R. 436.

### iii.   Dr. Wong (Pain Management Specialist)

On December 31, 2009, at an appointment to follow up on her cervical spine MRI, Ramos-Birola was referred to Dr. Anthony Wong for pain management. R. 509. At his first meeting with Ramos-Birola, on February 8, 2010, Dr. Wong recommended cervical epidural steroid injections to treat her neck pain. R. 506–08. One of these injections was administered on February 22, 2010. R. 504. On March 24, 2010, Ramos-Birola returned to Dr. Wong and reported no improvement after the injection. R. 495. Dr. Wong recorded the following assessment: "I believe now that her symptoms are more related to her fibromyalgia than cervical radiculopathy." R. 495. Ramos-Birola returned to Dr. Wong on May 13, 2010 and he repeated that assessment. R. 491.

### b.   Fibromyalgia

On May 11, 2009, Dr. Katz-Pollak recommended that Ramos-Birola see Dr. Guttell, a rheumatologist. R. 367. On June 8, 2009, Dr. Guttell met with Ramos-Birola and performed a musculoskeletal examination. R. 416. At that time, he recorded the following impression: "The patient is a 35 year old woman with multiple tender points and generalized pain and insomnia with negative serologies and reasonably normal lumbar spine x-rays and MRI's, all of [which] is consistent with fibromyalgia." R. 416–17. Dr. Guttell also met with Ramos-Birola on June 29, August 25, October 6, and December 9, 2009, and then on March 16, April 29, and June 24,

2010. R. 357, 379, 410, 489, 494, 502, 511.  At each exam, he noted positive findings for tender points and repeated his diagnosis of fibromyalgia.  Id.

### c.   Hand Nerve Issues/Carpal Tunnel Syndrome (CTS)

On May 26, 2009, Ramos-Birola reported pain in her right hand to Dr. Katz-Pollak. R. 545.  On May 29, 2009, Ramos-Birola saw Dr. Cornelissen for this same pain.  R. 377.  Dr. Cornelissen's assessment was that Ramos-Birola suffered from carpel tunnel syndrome ("CTS") and he ordered a nerve conduction study.  R. 377–78.  The study was performed on June 30, 2009 and showed "evidence of severe right carpal tunnel syndrome."  R. 423.  On July 7, 2009, in follow up to the nerve conduction study, Dr. Cornelissen repeated his assessment of CTS and recommended a carpal tunnel release surgery.  R. 392.  This surgery was performed on August 31, 2009. R. 430.  After the surgery, on September 15, 2009, Ramos-Birola reported no tingling or numbness in her fingertips and stated that her pain was well controlled.  R. 352.  On October 13, 2009, during another visit, Dr. Cornelissen noted that Ramos-Birola "states improvement in her symptoms overall following carpal tunnel release but continues to have some discomfort to palpation across the incision site as well as with repetitive gripping of the right hand."  R. 514.

### d.   Mental Health Issues:  Depression and Anxiety

On June 17, 2009, Ramos-Birola reported to Dr. Katz-Pollak that she was unable to sleep at night, that she was depressed, and that she was crying a lot.  R. 369.  She also reported that she was seeing a psychologist.  R. 369.  On June 24, Ramos-Birola met with Vanessa De Jesus, M.S.W., who filled out a "Diagnostic/Treatment Plan" form.  R. 340–44.  Ramos-Birola reported that she had experienced a depressed mood, low motivation, a decrease in the ability to sleep, an increase in appetite, and a decrease in concentration and that these symptoms had lasted for five months.  R. 340.  Ms. De Jesus diagnosed a clinical disorder with a single episode of major

depressive disorder that is severe but without psychotic features, R. 343 (noting Diagnostic and Statistical Manual ("DSM") code 296.23); see also American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 370 (4th ed., text rev. 2000) (hereinafter "DSM-IV").  Ms. De Jesus noted that Ramos-Birola's depressed mood was a seven on a scale of nine and that her sleep disturbance was an eight on a scale of nine. R. 344. Ms. De Jesus also recorded a current GAF score of 50 and a range of GAF scores in the last year between 50 and 80.[1] R. 343. De Jesus recommended cognitive behavioral therapy sessions twice monthly and psychopharmacology appointments once monthly.  R. 344.  The record contains subsequent treatment plans from Ms. De Jesus that noted the severity of Ramos-Birola's depression in the moderate range (six on a scale of nine).  R. 570, 566.  In March, June, and July of 2010 progress notes from counseling sessions with Ramos-Birola, Ms. De Jesus noted symptoms of depression. See R. 558–60, 562–63.

On August 7, 2009, Ramos-Birola began her psychopharmacological treatment with psychiatrist Dr. David Green.  R. 346.  At this first appointment, Dr. Green diagnosed her with acute stress disorder and recurrent major depressive disorder of moderate severity.  R. 370.  Dr. Green noted a GAF score of 55.  R. 346.  He also prescribed Xanax and Zoloft.  R. 346.  Ramos-Birola thereafter met at least every other month with Dr. Green for medication management.  See R. 561, 565, 567–68, 571–72.  Dr. Green occasionally noted changes in Ramos-Birola's symptoms, such as severe increases in overeating and anxiety, R. 568, and also severe

---

[1] "The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social and occupational functioning and refers to the level of functioning at the time of evaluation."  Vazquez v. Astrue, 2011 WL 1564337 at *1 n. 1 (D. Mass. Apr. 25, 2011) (citing DSM-IV 32–33). A GAF score of 41 to 50 reflects "serious symptoms or any serious impairment in social, occupation, or school functioning." Kiklis v. Astrue, 2011 WL 4768491 at *4 n. 2 (D. Mass. Sept. 28, 2011) (citing DSM-IV 34). A GAF of 51-60 indicates "moderate symptoms or moderate difficulty in social or occupational functioning." Pina v. Astrue, 2007 WL 2071791 at *1 n. 3 (D. Mass. July 18, 2007) (citing DSM-IV 34).

environmental stress related to crowding, noise, and conflicts in the shelter in which Ramos-Birola and her children were living.  R. 561.

### e.   RFC assessments

#### i.   Dr. Katz-Pollak

Dr. Katz-Pollak completed a physical RFC questionnaire on June 17, 2009.  R. 555–57. He appears to have signed the same form again on June 30, 2010.  R. 557.  He noted that her experience of pain and other symptoms is severe enough to interfere frequently with Ramos-Birola's attention and concentration.  R. 555.  He stated that she is markedly limited in her ability to deal with work stress, can walk less than one block without rest, can sit continuously for only 20 minutes at a time and that she can stand continuously for only 20 minutes at a time.  R. 555-56.  He further noted that she can sit for only two hours total in an eight-hour workday and that she can stand for only two hours total as well.  R. 556.  To the question "Approximately how often must your patient walk?," Dr. Katz-Pollak indicated fifteen minutes.  R. 556.  To the immediately subsequent question "Approximately how long must your patient walk each time?," Dr. Katz-Pollak indicated ten minutes.  R. 556.  He noted that Ramos-Birola would need a job that permits shifting at will from sitting, standing, or walking and would allow her to take unscheduled breaks from working every ten to 15 minutes during an eight-hour working day, but he added that he was unsure how long the breaks would need to last without further evaluation by Dr. Guttell.  R. 556.  Dr. Katz-Pollak noted that Ramos-Birola can only occasionally lift and carry items ten pounds or less, and that she can never lift and carry items that are 20 or more pounds, had significant limitations in performing repetitive reaching, handling, or fingering motions, could bend and twist at the waist only 15% of the time.  R. 557.  Finally, he said

Ramos-Birola's impairments and treatments would cause her to be absent from work more than three times a month.  R. 557.

### ii.   Dr. Green and Ms. De Jesus

On July 2, 2010, Dr. Green and Ms. De Jesus jointly signed a mental impairment questionnaire.  R. 584.  They noted diagnoses of major depressive disorder that is severe but without psychotic features and generalized anxiety disorder.  R. 581.  They noted a GAF score of 50.  R. 581.  They noted that these impairments are expected to last at least twelve months.  R. 582.  They stated that Ramos-Birola's psychiatric conditions do not exacerbate her physical symptoms.  R. 582.  They noted that Ramos-Birola has a low I.Q. or reduced intellectual functioning and she experiences marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace.  R. 583.  They stated that Ramos-Birola would experience continual episodes of deterioration or decompensation in work or work-like settings, which would cause her to withdraw from those situations or exacerbate her signs or symptoms.  R. 583.  They anticipated Ramos-Birola's impairments would cause her to be absent from work more than three times per month.  R. 584.

### iii.   Dr. Mark Colb (State Agency Physician)

On July 23, 2009, Dr. Colb completed a physical RFC assessment.  R. 329–36.  He noted that Ramos-Birola can frequently lift and carry ten pounds, occasionally lift and carry 20 pounds, stand or walk with normal breaks for a total of about six hours in an eight-hour workday and that she can sit with normal breaks for a total of about six hours as well.  R. 330.  Dr. Colb explained these limitations by citing Ramos-Birola's back pain and obesity.  R. 330.  With respect to postural limitations, Dr. Colb stated that Ramos-Birola can only occasionally climb, balance,

stoop, kneel, crouch and crawl.  R. 331.  He further stated that Ramos-Birola does not have any manipulative, visual, communication, or environmental limitations.  R. 332–33.

### iv.   Dr. Phyllis Sandell (State Agency Physician)

On November 28, 2009, Dr. Sandell completed a physical RFC assessment.  R. 450–57. She stated that Ramos-Birola can frequently lift and carry ten pounds and that she can occasionally lift and carry 20 pounds, can stand or walk with normal breaks for a total of about six hours in an eight-hour workday and that she can sit with normal breaks for a total of about six hours as well.  R. 451.  Dr. Sandell explained these limitations with reference to Ramos-Birola's back pain.  R. 451.  She also noted that "[f]ibromyalgia is being considered" and that Ramos-Birola had surgery for CTS.  R. 451.  With respect to postural limitations, Dr. Sandell stated that Ramos-Birola can only occasionally climb, balance, stoop, kneel, crouch and crawl.  R. 452.  Dr. Sandell said Ramos-Birola's only manipulative limitation is that she can only occasionally grasp and twist with her right hand.  R. 453.  She concluded that Ramos-Birola has no visual, communication or environmental limitations.  R. 453–54.

### v.   Carol McKenna, Ph.D. (State Agency Consultant)

On December 10, 2009, Dr. Carol McKenna completed a mental RFC assessment.  R. 472–74.  She noted moderate limitations in Ramos-Birola's ability to understand and remember detailed instructions, that she can comprehend and recall only simple information, had moderate limitations in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 473.  She added that Ramos-Birola would be

able to sustain tasks for two-hour increments across an eight-hour workday for five days per week. R. 474.

### 2.  ALJ Hearing

At the July 26, 2010 administrative hearing, the ALJ heard testimony from Ramos-Birola and vocational expert Larry Takki ("VE").  R. 7, 47-55.

### a.  Ramos-Birola's Testimony

Ramos-Birola testified that she had been previously employed as a laborer at an oil company for two years, R. 35–36, a cook at a fast food restaurant for two years, R. 35-37, as a laborer at a tuxedo factory for four years, R. 37, a laborer at an alarm clock factory for six years, R. 37–38, an assembler at a perfume company, R. 38, a supervisor at a sewing company, R. 39, and a clothing and towel folder at a veteran's hospital for about three months, R. 42–43.

Ramos-Birola testified that her most significant physical issue is widespread pain.  R. 40. She stated that this pain began in 2006 and that the pain is exacerbated by working too long or lifting heavy things.  R. 40.  She stated that her medications produce side effects, including headaches, dizziness, disorientation, tiredness, nausea and loss of appetite.  R. 40.  She testified that she receives injections that "alleviate the pain a little bit."  R. 41.

Ramos-Birola testified that she goes to bed at about eight o'clock at night and that she is unable to sleep through the night.  R. 46.  She claimed she wakes up approximately two times per night due to her pain and it takes about half an hour to get back to sleep.  R. 46.  She said she wakes up around six o'clock in the morning, R. 41, and that she gets about six to seven hours of sleep per night.  R. 46.

Ramos-Birola reported daily activities that include washing her mouth, preparing breakfast, watching television and going on walks with her daughter.  R. 41.  She further stated

that she reads during the day and that, "[i]f my girl helps me to do the cooking . . . I tell her what to do."  R. 42.  In response to the question "So how long do you walk when you go for a walk?" Ramos-Birola answered, "About 15 minutes. I stop, I rest, and go back."  R. 41.  In response to the question "How many walks do you take per day?"  Ramos-Birola stated that she walks in the morning and afternoon, depending on how she feels.  R. 41–42.  She stated that she can sit down for about 20 minutes before she needs to get up, move, or change positions.  R. 44.  She also stated that she can stand for 20 minutes and that she can walk approximately 15 minutes at a time.  R. 44.

Regarding her mental health, Ramos-Birola testified that it had been stressful and difficult for her to live in a shelter but that she had been given a provisional apartment and the conditions were better.  R. 44-45.  She also testified that she had been having problems with her daughter, but that with medication and therapy her daughter had been behaving better.  R. 45. She reported that her mental health medications "help me some" but that they "get me tired during the day" and made her "feel dizzy."  R. 46.

### b.  VE's Testimony

The VE responded to four hypothetical questions involving individuals with the same age, education and vocational background as Ramos-Birola.  R. 51–54.  The first question, posed by the ALJ, was limited to light work and occasionally grasping and twisting with the right dominant hand.  R. 51–52.  The VE testified that such individual would not be capable of performing Ramos-Birola's previous work.  R. 52.  He also testified that this individual would be capable of performing the occupation of flagger.  Id.

The ALJ's second hypothetical was the same as the first, but required a sit/stand option with changes every 20 minutes.  R. 52–53.  With that restriction, the VE said, there is no work available in substantial numbers in the U.S. economy.  R. 53.

The third hypothetical, suggested by Ramos-Birola's attorney,  involved an individual was limited in the same way as the individual in the first two questions, but also had an expected (unexcused) absentee rate of approximately two to three days per month.  R. 53.  The VE testified that no job would satisfy this hypothetical.  R. 53.

The ALJ suggested a fourth hypothetical, with an individual possessing the same impairments as the first, but limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  R. 53.  The VE testified that these limitations did not change the answer to hypothetical number one.  R. 53.  He also added that the job of inserter was available to this individual.  R. 54.

The VE further testified, in response to a question from Ramos-Birola's attorney, that none of the hypothetical individuals would be able to find work if they required approximately three unscheduled, unexcused breaks through the day, lasting ten to fifteen minutes and taking place outside the normal scope of breaks.  R. 54.

### 3.   Findings of the ALJ

Following the five-step process of 20 C.F.R. § 416.920, the ALJ found at step one that Ramos-Birola had not engaged in substantial gainful activity since March 31, 2009.  R. 9.  Ramos-Birola does not dispute the finding at step one.

At step two, the ALJ found that Ramos-Birola had the following severe impairments: degenerative disc disease, major depressive disorder, anxiety and obesity.  R. 9.  The ALJ also found that, while Ramos-Birola had been diagnosed with osteoarthritis of her knee, this

impairment was not severe.  R. 9.  She found further that Ramos-Birola's CTS "is non-severe, particularly following her carpal tunnel release."  R. 9.  Finally, she found that, "[a]lthough the records indicate the claimant has been treated for fibromyalgia, the medical evidence does not establish that the claimant meets the criteria for this diagnosis."  R. 10.  Ramos-Birola disputes the ALJ's step two finding that her CTS is not a severe impairment, Pl. Mem. 8–9, and she disputes the ALJ's finding that her fibromyalgia is not a medically determinable impairment.  Id. at 4–7.

At step three, the ALJ found that Ramos-Birola did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 10.  Ramos-Birola does not dispute the ALJ's finding at step three.

Before making her step four finding, the ALJ examined Ramos-Birola's RFC.  She determined that Ramos-Birola:

> has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant can only occasionally climb, balance, stoop, kneel, crouch or crawl. She is also limited to occasional grasping and twisting with the right dominant hand. In addition, she is limited to unskilled work with simple tasks requiring only basic English.

R. 12.  On the basis of this RFC finding, the ALJ determined at step four that Ramos-Birola is unable to perform any of her past relevant work as a production assembler, clothes washer, general helper, or clothes folder.  R. 16–17.  Ramos-Birola disputes the ALJ's RFC assessment, Pl. Mem. 4–15, but does not otherwise dispute the ALJ's finding at step four.

At step five, the ALJ found that, despite Ramos-Birola's physical and mental impairments, there are still jobs that exist in significant numbers in the national economy that

Ramos-Birola can perform.  R. 17.  Ramos-Birola disputes the finding at step five.  Pl. Mem. 4–5.

### C.  Ramos-Birola's Challenges to the ALJ's Findings

Ramos-Birola contends that the ALJ erred by: (1) finding at step two that Ramos-Birola's fibromyalgia did not amount to a medically determinable impairment; (2) finding at step two that Ramos-Birola was not severely impaired by CTS; (3) ascribing limited credibility to Ramos-Birola's statements about the intensity, persistence, and limiting effects of her symptoms; (4) not granting greater weight, in her RFC determination, to the opinions of Ramos-Birola's treating physicians than to the opinions of the non-treating physicians; (5) not explicitly considering, in her RFC determination, Dr. Katz-Pollack's opinion that Ramos-Birola would need to be absent from work more than three times per month due to her impairments; and (6) not referring, at step two or in the RFC analysis, to the reports of Ramos-Birola's mental health professionals to assess her physical condition.  The Court will address each of these contentions in turn.

### 1.  Fibromyalgia as a Medically Determinable Impairment

The ALJ found at step two that, "[a]lthough the records indicate the claimant has been treated for fibromyalgia, the medical evidence does not establish that the claimant meets the criteria for this diagnosis."  R. 10.  Ramos-Birola contends that the ALJ erred in making this finding and that the ALJ should have instead found Ramos-Birola's fibromyalgia to be a medically determinable impairment.

### a.  Standard of Review

In determining whether a claimant is disabled, the Commissioner is required to "consider all [the claimant's] symptoms, including pain, and the extent to which [his or her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence,"

including the claimant's statements about his or her pain.  20 C.F.R. § 404.1529(a).  However,

"statements about [the claimant's] pain or other symptoms will not alone establish that [he or

she] is disabled; there must be medical signs and laboratory findings which show that [the

claimant has] a medical impairment(s) which could reasonably be expected to produce the pain

or other symptoms alleged."  Id.  Medical signs are "anatomical, physiological, or psychological

abnormalities which can be observed, apart from [the claimant's] statements (symptoms)" and

which "must be shown by medically acceptable clinical diagnostic techniques."  Id. §

404.1528(b).  Laboratory findings are "anatomical, physiological, or psychological phenomena

which can be shown by the use of medically acceptable laboratory techniques."  Id. §

404.1528(c).

Fibromyalgia cases do not fit neatly into this procedural schema because they blur the

line between objective medical "signs" and subjective medical "symptoms."  As the First Circuit

has recognized, "'[t]he musculoskeletal and neurological examinations are normal in

fibromyalgia patients, and there are no laboratory abnormalities.'"  Johnson v. Astrue, 597 F.3d

409, 410 (1st Cir. 2009) (quoting Harrison's Principles of Internal Medicine 2056 (16th ed.

2005)).  Consequently, "a patient's report of complaints or history" – that is to say, his or her

subjective report of symptoms – "is an essential diagnostic tool in fibromyalgia cases."  Id. at

412 (citation and quotations omitted).

In Johnson, the First Circuit said that this reliance on subjective symptoms in the

diagnosis of fibromyalgia does not run afoul of SSA procedures.  See Johnson, 597 F.3d at 412.

In that case, an ALJ had ascribed little weight to a treating rheumatologist's RFC assessment

because it was based on a fibromyalgia patient's subjective reports of pain.  Id.  The court said

that, because complaints of pain are essential diagnostic tools in fibromyalgia cases, a "treating

18

physician's reliance on such complaints hardly undermines his opinion as to the patient's functional limitations." Id. (citation and quotations omitted). The court also noted that, even though there are no musculoskeletal, neurological, or laboratory abnormalities that can diagnose fibromyalgia, the American College of Rheumatology ("ACR") nonetheless has established criteria for diagnosing fibromyalgia. Id. at 410. These criteria include the presence of pain on both sides of the body, above and below the waist, and also positive findings on a tender point exam – that is, a physical exam looking for tenderness in at least 11 of 18 identified sites. Id. The court later held that, "since trigger points [i.e., tender points] are the only 'objective' signs of fibromyalgia, the ALJ effectively was requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines, and this, we think, was error." Id. at 412 (citations and quotations omitted).

Among the courts that have looked to Johnson for guidance in fibromyalgia cases, there has been no disagreement as to that case's central holding – namely that reliance upon subjective reports of fibromyalgia symptoms, including complaints of pain, bears upon a diagnosis of fibromyalgia and such reliance does not mean that fibromyalgia is not a medically determinable impairment. See Small v. Astrue, 840 F. Supp. 2d 458, 464-65 (D. Mass. 2012); Strother v. Astrue, No. 09-30122-MAP, 2011 WL 808873, at *6 (D. Mass. Mar. 2, 2011); Cortes-Vazques v. Astrue, No. 10-11092-JLT, 2011 WL 3652771, at *6-10 (D. Mass. Jul. 21, 2011); see also O'Brien v. Soc. Sec. Admin. Comm'r, No. 11-00193, 2012 WL 1041323, at *7-8 (D. Me. Mar. 23, 2012); Bond v. Soc. Sec. Admin. Comm'r, No. 11-00054-JAW, 2012 WL 313727, at *7 (D. Me. Jan. 30, 2012); Haggblad v. Astrue, No. 11-028-JL, 2011 WL 6056889, at *9-10 (D.N.H. Nov. 17, 2011).

### b.   Application to Ramos-Birola

While the cases cited above may offer different approaches to the kind of evidence necessary or sufficient under <u>Johnson</u> to translate subjective reports of fibromyalgia pain into objective medical evidence of fibromyalgia, under any of reading of <u>Johnson</u>, the ALJ's conclusion here that Ramos-Birola's fibromyalgia is not a medically determinable impairment is not supported by substantial evidence.

Under <u>Small</u>'s reading of <u>Johnson</u>, an ALJ cannot "focus their fibromyalgia analysis solely on the existence of trigger points" since "[g]iven fibromyalgia's nature, weight must be given to subjective, as well as objective, determinations."   <u>Small</u>, 840 F. Supp. 2d at 464. However, here, the ALJ did just that.   She rejected Ramos-Birola's fibromyalgia diagnosis because, she said, Ramos-Birola "has never been diagnosed with the disorder applying the standards set forth by the American College of Rheumatology" (i.e., test involving trigger points).   R. 10.   Similarly, under <u>O'Brien</u>'s reading, an ALJ cannot demand to see these standards met unless guided by an expert.   <u>O'Brien</u>, 2012 WL 1041323, at *7 & n. 3. But that guidance was not present here.   No expert on record criticized the standards used to diagnosis Ramos-Birola with fibromyalgia or suggested that the ACR standards need to be met for such diagnosis.

Under <u>Strother</u>'s reading of <u>Johnson</u>, this Court would not inquire into the means of diagnosis (i.e., presence/absence of trigger points) once doctor(s) had determined that the claimant suffered from fibromyalgia.   <u>Strother</u>, 2011 WL 808873, at *6.   Even this approach would pose a problem here:  the ALJ was wrong to find that the appropriate diagnostic standards had not been met. In support of her finding that there was no basis for Ramos-Birola's fibromyalgia diagnosis, the ALJ pointed to three things.   First, she pointed to Dr. Wong's initial

examination of Ramos-Birola in which Dr. Wong noted that Ramos-Birola had "[n]o palpable trigger points." R. 507. However, this evidence is far from conclusive because it is not apparent that Dr. Wong was noting this lack of trigger points as part of a fibromyalgia examination. Dr. Wong is not a rheumatologist and Ramos-Birola was not seeing him for fibromyalgia diagnosis or treatment. R. 506. Furthermore, as explained above, while "trigger point" and "tender point" are sometimes used interchangeably to describe the sites in an ACR exam, "trigger point" has an additional, distinct medical meaning. From Dr. Wong's treatment note, it is unclear whether he examined Ramos-Birola for fibromyalgia-related trigger points (that is, for tender points) or the alternative kind of trigger points. Finally, and most importantly, Dr. Wong drew no conclusions from his trigger point examination about Ramos-Birola's fibromyalgia diagnosis. R. 506-07.

Second, the ALJ pointed to another treatment note from Dr. Wong "indicating that he believed the claimant may have fibromyalgia." R. 10. But, the ALJ said, "he did not provide any objective evidence supporting a diagnosis of fibromyalgia." R. 10. However, the lack of diagnostic evidence of fibromyalgia from one physician is not evidence that diagnostic evidence is missing altogether, particularly when that physician was not seeing the patient for fibromyalgia diagnosis or treatment. Here, as discussed below, physicians other than Dr. Wong did provide diagnostic evidence of Ramos-Birola's fibromyalgia.

Third, the ALJ claimed that Dr. Guttell "has never conducted any trigger point testing." R. 10. On this point, the ALJ is simply wrong. Dr. Guttell first examined Ramos-Birola on June 8, 2009. R. 416. His examination included references to tender point areas included in the ACR's lists of tender point sites. R. 416. He noted specifically that Ramos-Birola "had tender points over the proximal supraspinatus, medial scapula areas, and the posterior cervical muscles" but that there was "[n]o tenderness over the trochanteric bursa. Knees, ankles and feet are fine."

21

Id.  Guttell's resulting impression was that Ramos-Birola "is a 35 year old woman with multiple tender points and generalized pain and insomnia with negative serologies and reasonably normal lumbar spine ex-rays and MRI's" and that "all of this is consistent with fibromyalgia."  Id.

Dr. Guttell examined Ramos-Birola seven times over the next year.  R. 357, 379, 410, 489, 494, 502, 511.  As part of each examination, he noted the presence or absence of pain at sites included in the ACR's list.  Id.  For example, on August 25, 2009, Guttell noted, "[w]rists, elbows and shoulders are fine.  She had tender points over lateral epicondyles, supraspinatus, posterior cervical and medial scapula.  She had tender points over trochanteric bursa."  R. 357. On March 16, 2010, he noted, "Her elbows have tenderness over the lateral epicondyle but she has full flexion and extension. . . . She has tenderness throughout the supraspinatus muscles, the posterior cervical muscles and the trapezius muscles with multiple tender points.  Her hips have full range of motion with tenderness over both of the trochanteric bursa."  R. 502.[2]  In addition, during each of these seven subsequent examinations, Dr. Guttell included "fibromyalgia" as one of his impressions.  R. 357, 379, 410, 489, 494, 502, 511.

The Commissioner acknowledges that Dr. Guttell performed tender point testing, but argues that Dr. Guttell's treatment notes never mention the ACR standards and that the record does not contain medical findings equivalent to what these standards require.  Def. Mem. 6. Referring specifically to the March 16, 2010 treatment note above, the Commissioner contends that "[r]ead generously, this treatment note evidences at most tenderness at six of the eighteen points specified in the ACR standards (bilateral trapezius, bilateral supraspinatous [sic], and

_____

[2] Moreover, in Bond, there were conflicting medical opinions about the diagnosis of fibromyalgia and the tender point examination on record showed only one tender point, not "multiple" tender points, as in Johnson.  Id. at *4.  The results of Ramos-Birola's exams showed multiple tender points, R. 357, 379, 410, 416, 489, 494, 502, 511, and therefore were unlike the examination in Bond and like the examinations in Johnson.

bilateral trochanter)." [3]  Id.  But, as in Johnson, Dr. Guttell's diagnosis was based in part on the existence of "multiple" tender points.  See Johnson, 597 F.3d at 411.  In fact, each of his examinations demonstrated the existence of multiple tender points.  R. 357, 379, 410, 416, 489, 494, 502, 511.

For the foregoing reasons, the Court cannot conclude that there was substantial evidence in the record to support a finding that Ramos-Birola's fibromyalgia is not a medically determinable impairment.  Therefore, the ALJ erred by not crediting this impairment.

## 2.   Rejecting CTS as a Severe Impairment

Ramos-Birola also argues that the ALJ erred by finding, at step two, that she was not severely impaired by CTS.  Pl. Mem. 8–9.  Unlike the ALJ's finding regarding fibromyalgia, there was substantial evidence in the record to support this finding, and even if there is not, the error was harmless.

Dr. Cornelissen performed a carpal tunnel release surgery on August 31, 2009.  R. 430. In September and October, Dr. Cornelissen saw Ramos-Birola for follow-up visits.  R. 514, 519. The ALJ noted that, in September 2009, Ramos-Birola reported that there was no longer tingling or numbness in her fingertips, R. 10, and that, in October, Ramos-Birola reported that her symptoms had improved overall.  R. 10.  The ALJ also pointed to treatment notes from Dr. Cornelissen in March 2010 and Dr. Guttell in June 2010.  R. 10.  These treatment notes showed that Ramos-Birola's sensation was intact throughout her fingertips, R. 512, and that she had a good grip and normal fist with no synovitis.  R. 489.

Ramos-Birola argues that the ALJ omitted and misrepresented contrary evidence related to her CTS.  Pl. Mem. 9.  She points, in particular, to a February 8, 2010 treatment note from Dr.

---

[3] The note also refers to tenderness in the lateral epicondyle, R. 502, which is an ACR tender point site.

Wong, not mentioned in the ALJ's decision, that described symptoms consistent with CTS. Id. In this note, Dr. Wong wrote that Ramos-Birola "was discovered to have right carpal tunnel syndrome and underwent carpal tunnel release by Dr. Cornelissen without alleviation of her hand symptoms. She admits to numbness and paresthesias in her right third and fourth fingers as well as the lateral forearm. She notes right hand weakness as well." R. 506.

However, on February 8, Ramos-Birola was seeing Dr. Wong for pain that was radiating from her neck down her arms – and particularly her right arm – to her fingertips. R. 506. Ramos-Birola had already seen Dr. Cornelissen in December 2009 for these symptoms, and Dr. Cornelissen did not attribute these symptoms to CTS. R. 512. Instead, he suggested cervical radiculopathy as the likely cause. R. 512. Dr. Cornelissen saw Ramos-Birola again in February 2010 for pain radiating from the neck through the right hand. R. 503. Once again, his assessment was cervical radiculopathy, not CTS. R. 503. When Dr. Wong examined Ramos-Birola on February 8, he did not attribute her symptoms to CTS either. R. 506. Instead, he determined that Ramos-Birola's neck and arm pain were "likely secondary to lumbar radiculopathy stemming from C6-7 disk protrusion." R. 507. After Ramos-Birola saw no improvement from a later cervical steroid injection, Dr. Wong determined that cervical radiculopathy was not the likely cause of her symptoms. R. 491, 495. However, at that time he did not suggest CTS as an alternative likely cause, but instead suggested fibromyalgia. R. 491, 495.

In summary, Ramos-Birola reported significant improvement in her CTS symptoms after her carpal tunnel release. While she was later treated for symptoms that appear to have been consistent with CTS, her treating physicians in those cases did not diagnose CTS but instead

attributed her symptoms to other causes.  Therefore, there is substantial evidence in the record to support the ALJ's finding at step two that Ramos-Birola was not severely impaired by CTS.

Even if the ALJ erred in making this finding, though, the error is harmless.  The ALJ found other impairments, besides CTS, to be severe at step two, and then engaged in RFC analysis that considered the individual and cumulative effect of <u>all</u> Ramos-Birola's impairments, including her hand impairment, at later steps.  R. 12, 16.  Because the ALJ appropriately considered any impairment that would have resulted from CTS in her RFC finding, an error in finding Ramos-Birola's CTS non-severe at step two would be harmless.  <u>See</u> <u>Perez v. Astrue</u>, 2011 WL 6132547 at *4 (D. Mass. Dec. 7, 2011) (finding a step two error harmless when the ALJ considered all symptoms "both severe and non-severe, in assessing Plaintiff's residual functional capacity and there is no indication that the ALJ failed to consider the cumulative effect of those impairments").

### 3.   Ramos-Birola's Credibility

Ramos-Birola argues that the ALJ erred by finding her statements about the intensity, persistence, and limiting effects of her mental and physical symptoms to be less than fully credible.  Ordinarily, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  <u>Frustaglia v. Sec'y of Health and Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987).  However, the ALJ's credibility determination is entitled to this deference only when it is supported by substantial evidence.  <u>See id.</u>; <u>see also</u> 42 U.S.C. § 405(g).  Here, there was substantial evidence to support the ALJ's credibility finding with respect to Ramos-Birola's statements about her mental impairments.  However, the ALJ arrived at her credibility determination regarding Ramos-Birola's statements

about her physical impairments without considering all relevant evidence. Therefore, Ramos-Birola is correct, at least in part, that the ALJ erred in her credibility finding.

There is a two-step process for evaluating the credibility of a claimant's statements about his or her symptoms. See Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 at *2 (Jul. 2, 1996). The ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id.; see also 20 C.F.R. § 404.1529(b). If such an underlying impairment has been shown to exist, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186 at *2.

At this second step, a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." Id. at *1. When the individual's statements about the intensity, persistence, or functionally limiting effects of pain are not supported by objective medical evidence, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." Id. at *2. This means the ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Id.

Here, the ALJ found, in the first step of the credibility analysis, that Ramos-Birola's medically determinable impairments could reasonably be expected to produce her alleged symptoms.  R. 13.  At step two of the credibility analysis, though, the ALJ found that Ramos-Birola's statements about the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment.  R. 13.

The ALJ began the latter analysis by claiming that Ramos-Birola's statements about the severity of her physical pain were not supported by the objective medical findings.  R. 13.  As evidence of this lack of support, the ALJ noted that Ramos-Birola's MRI, x-ray and EMG results were all either normal or showed minor abnormality.  Id.  She noted that Ramos-Birola exhibited no difficulty walking during her medical examinations and that she had no antalgic gait.  R. 14.  She also noted normal strength, normal range of motion, and a lack of clubbing, cyanosis, edema, synovitis.  R. 14.  The problem with the ALJ's reliance on this evidence, however, is that she did not consider Ramos-Birola's fibromyalgia to be a medically determinable impairment.  Had she done so she would have seen that the evidence to which she pointed is irrelevant for evaluating fibromyalgia pain.  See Johnson, 597 F.3d at 410 (noting that "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities" (quotations omitted)).  Since the objective evidence the ALJ amassed is irrelevant for determining whether Ramos-Birola experienced fibromyalgia pain, it cannot serve as substantial evidence in support of the ALJ's credibility finding.

The ALJ also found that the objective medical record did not substantiate the severity of Ramos-Birola's reported mental impairments.  R. 13.  The ALJ noted that, while Ramos-Birola had been diagnosed with depression and anxiety disorders, her psychologist and psychiatrist noted normal mental processes, judgment, speech and thought processes, memory, and

perception.   R. 13.   The ALJ also pointed to GAF scores, recorded by Ramos-Birola's psychiatrist and psychologist, that suggested moderate to slight symptoms.   R. 13.   Taken together, these medical records amount to substantial evidence supporting the ALJ's conclusion that Ramos-Birola's claims about her mental impairments are not substantiated.

The ALJ next considered the remainder of the case record outside the objective medical evidence.   She first found that Ramos-Birola's statements about her physical pain were inconsistent with the medical treatment Ramos-Birola had received because that treatment had been "conservative."   R. 14.   However, it is apparent that the ALJ only compared the treatment Ramos-Birola received with the pain that could be expected from her degenerative disc disease. See R. 14.   The ALJ did not compare the treatment Ramos-Birola received for fibromyalgia with her reported pain.   See R. 14.   Therefore, a finding that Ramos-Birola's statements about the severity of her pain were inconsistent with her treatment cannot be upheld.

The ALJ also said Ramos-Birola's daily activities were not as limited as would be consistent with her reported symptoms.   R. 14.   She said Ramos-Birola has "described a wide range of daily activities involving self-care, preparing meals, and other activities requiring attention and concentration such as reading and watching television."   R. 14.   Here, the ALJ likely intended to show inconsistency between Ramos-Birola's statements about her mental abilities and her daily activities.   This inconsistency lends substantial support to the ALJ's finding that Ramos-Birola's mental impairments are not as severe as Ramos-Birola claims.   The ALJ also appears to have intended to show inconsistency between Ramos-Birola's daily activities and her statements about her physical pain – and in particular, her statement that she can stand only up to 20 minutes at a time or walk only up to 15 minutes at a time.   See R. 12. However, in Johnson, the First Circuit rejected similar findings by an ALJ about inconsistencies

between physical pain and daily activities.  The court said, "[a]s for claimant's daily activities, the ALJ relied on the fact that claimant could engage in some of these activities – e.g., light housework, meal preparation, and driving short distances," but "such activities are not necessarily inconsistent with [the doctor's] opinion that claimant could sit for four hours per eight-hour day and could walk and stand for one hour each during the same period." Johnson, 597 F.3d at 414.  Similarly, here, Ramos-Birola's daily activities of self-care and preparing meals are not necessarily inconsistent with her claim that she can stand only up to 20 minutes at a time or walk only up to 15 minutes at a time.

There was substantial evidence in the record to support the ALJ's finding that Ramos-Birola's statements about her mental impairments are inconsistent with the objective medical evidence.  As a result, there is substantial evidence to support the ALJ's finding that Ramos-Birola's mental impairments are not as severe as she states.  Therefore, upon remand, the ALJ does not need to reconsider the credibility of Ramos-Birola's statements about her mental impairment.  However, the ALJ did not evaluate Ramos-Birola's statements about her physical impairments in light of all of the relevant facts.  Therefore, upon remand, the ALJ must reconsider the credibility of these statements, taking into account evidence of Ramos-Birola's fibromyalgia diagnosis.

### 4.  Weight Afforded to Medical Opinions

The record contains opinions from treating sources and also from non-treating, non-examining state agency sources regarding the effects of Ramos-Birola's symptoms on her ability to engage in substantial gainful activity.  In making her RFC assessment, the ALJ afforded little weight to the opinions of Dr. Katz-Pollak and Dr. Green, who were the treating sources, R. 15, and great weight to Dr. Colb, Dr. Sandell, and Dr. McKenna, who were the non-treating, non-

examining state agency sources.  R. 16.  Ramos-Birola argues that the ALJ erred by granting more weight to the state agency sources than to the treating sources.

### a.   Factors to Apply in Weighing Evidence

The SSA regulations identify six factors to consider in weighing medical opinions and also two sub-factors.  See 20 C.F.R. § 404.1527(d)(1–6).  The six factors are the examining relationship, see id. § 404.1527(d)(1); treatment relationship, id. § 404.1502; supportability by presenting relevant evidence to support an opinion, see id. § 404.1527(d)(3); consistency, i.e., the more consistent an opinion is with the record as a whole, the more weight an ALJ must give it, see id. § 404.1527(d)(4); degree of specialization of the doctor giving the opinion, see id. § 404.1527(d)(5); and that the ALJ may consider other factors that tend to support or contradict an opinion.  See id. § 404.1527(d)(6).  If a source has a treating relationship with the claimant, an ALJ may also be required to consider the two sub-factors.  See id. § 404.1527(d)(2).  These sub-factors are the length of the treatment relationship and the frequency of examination, see id. § 404.1527(d)(2)(i); and the nature and extent of the treatment relationship.   See id. § 404.1527(d)(2)(ii).

### i.   State Agency Physicians

### 1)   Dr. Colb (Physical RFC)

Dr. Colb completed his physical RFC assessment in July 2009.  R. 336.  This assessment was provided in response to Ramos-Birola's initial application for disability benefits.  This initial application, however, did not include fibromyalgia as an alleged impairment, R. 329, and, as a result, Dr. Colb's assessment did not reference this condition.  See R. 330–36.  Because Dr. Colb's assessment was completed without consideration of Ramos-Birola's fibromyalgia, it was not well supported by the record at the time the record was considered by the ALJ.  See SSR 96-

6p, 1996 WL 374180 at *2 (noting that "the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . . including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency"); see also Rosario v. Apfel, 85 F. Supp. 2d 62, 68 (D. Mass. 2000) (holding that a non-treating physician's opinion should be afforded minimal if any weight because, among other reasons, the non-treating physician reviewed a partial record).

### 2)   Dr. Sandell (Physical RFC)

Dr. Sandell cited the following evidence in support of her RFC assessment:

36yoF has low back pain, also in entire spine from trapezius muscles to pelvis. MRI shows mild degenerative changes. PE good strength, sensation and ROM. She is sensitive to light touch thoracic and lumbar spine, somewhat distractable [sic]. Normal gait. She is going to PT and has had trial of prednisione [sic]. Fibromyalgia is being considered. No work restrictions.

Also had surgery for rt carpal tunnel syndrome.

R. 451.  The ALJ referred to some of this evidence in weighing Dr. Sandell's opinion.  See R. 16.  However, the ALJ did not consider fibromyalgia to be a medically determinable impairment and therefore did not analyze whether Dr. Sandell adequately considered the symptoms Ramos-Birola experienced from her fibromyalgia.  Upon remand, then, the ALJ must reconsider the supportability of Dr. Sandell's opinion, taking into account Ramos-Birola's fibromyalgia symptoms.

### 3)   Dr. McKenna (Mental RFC)

The ALJ noted that her opinion "is supported by the record as a whole."  See R. 16.

### ii.   Treating Physicians

### 1)   Dr. Katz-Pollak (Physical RFC)

31

The ALJ found that Dr. Katz-Pollak's opinion was not supported by objective evidence, such as physical exam findings or radiographs.  R. 15.  However, the ALJ made such determination in the context of not crediting Ramos-Birola's fibromyalgia diagnosis.  Had the ALJ credited this diagnosis, she may have well concluded that the evidence to which she pointed is irrelevant for evaluating fibromyalgia pain.  See Johnson, 597 F.3d at 410; Green-Younger 335 F.3d at 108.

The ALJ also determined that Dr. Katz-Pollak's opinion is inconsistent with Ramos-Birola's treatment history.  R. 15.  The only treatment the ALJ specifically mentioned is "medications and spinal shots."  R. 15.  Had Ramos-Birola suffered only from degenerative disc disease, then substantial evidence may have existed for the ALJ's finding that these treatments were inconsistent with the limitations Dr. Katz-Pollak identified. However, Ramos-Birola also suffered from fibromyalgia, and the use of medications is a treatment consistent with fibromyalgia pain.  See U.S. National Library of Medicine, Medline Plus, "Fibromyalgia," http://nlm.nih.gov/medlineplus/ency/article/000427.htm  (last visited September 24, 2012). Accordingly, upon remand, the ALJ must reassess its consideration of Dr. Katz-Pollak's opinion in the RFC assessment.

### 2)   Dr. Green and Ms. De Jesus (Mental RFC)

The ALJ determined that the mental impairment questionnaire signed by Dr. Green and Ms. De Jesus was "not generally supported by the longitudinal history of Dr. Green's treatment records."  R. 15.  The ALJ noted that Dr. Green had assigned a GAF score of 55 when he evaluated Ramos-Birola on August 7, 2009, indicating that Ramos-Birola only suffered moderate symptoms.  R. 15.  The ALJ also noted that, while Dr. Green's treatment notes record deterioration in Ramos-Birola's anxiety and stress, they did not say that Ramos-Birola was

decompensating.  R. 15–16.  The ALJ also noted that, according to Dr. Green's treatment notes, Ramos-Birola's mood and medications were stable.  R. 16. The differences between these treatment notes and the extent of impairment claimed in Dr. Green and Ms. De Jesus' questionnaire provide substantial evidence for the ALJ's finding that these opinions were not supported by the record.

### b.   Using the Factors to Weigh the Evidence

### i.   Controlling Weight

As a threshold matter, an ALJ must decide whether an opinion is entitled to "controlling weight," id., that is, whether it must be adopted, SSR 96-2p, 1996 WL 374188, at *1.  Four criteria determine whether an ALJ is required to give an opinion controlling weight.  Id. at *2; see also 20 C.F.R. § 404.1527(d)(2). First, the opinion must be from a "treating source." SSR 96-2p at *2.  Second, the opinion must be a "medical opinion." Id. See also 20 C.F.R. § 404.1527(a) ("medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)").  Third, the opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques.  SSR 96-2p, 1996 WL 374188, at *2; see also 20 C.F.R. § 404.1527(d)(2).  Fourth, the opinion must be not inconsistent with the other substantial evidence in the case record. SSR 96-2p, 1996 WL 374188, at *2; see also 20 C.F.R. § 404.1527(d)(2).

The ALJ found none of the opinions of Ramos-Birola's treating physicians to be entitled to controlling weight.  R. 15.  As shown above, there is substantial evidence in the record for the ALJ's finding that the mental RFC opinions of Dr. Green and Ms. De Jesus were not well supported.  Therefore, this Court will not disturb the ALJ's finding that the opinions of Dr. Green and Ms. De Jesus did not deserve controlling weight.  However, as shown above, the ALJ

must reconsider, on remand, whether Dr. Katz-Pollak's opinion is well supported and not inconsistent with substantial evidence the record.  In the process, the ALJ must reconsider whether Dr. Katz-Pollak's opinion is entitled to controlling weight.

Because Dr. Katz-Pollak's opinion, if given controlling weight, must be not inconsistent with the other substantial evidence in the record, the ALJ may be required to reconsider whether the opinions of the state agency physicians regarding the claimant's physical condition amount to substantial evidence.  The SSA regulations' weighing factors – which this Court discussed above – give the ALJ guidance for making this determination.  See Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994).

In Johnson, the First Circuit faulted an ALJ for relying on non-examining physician opinions.  597 F.3d at 412. Johnson considered the nature of fibromyalgia and also the information provided to the experts.  Id. at 412–13.  The court noted that "where a claimant's RFC depends in large part on the functional implications of his or her subjective symptoms, a treating physician's 'on-the-spot examination and observation of claimant might ordinarily be thought important.'"  Johnson, 597 F.3d at 412 (quoting Rose, 34 F.3d at 19).  For this reason, among others, the court criticized a non-examining physician's assessment for ignoring the on-record RFC opinion of a treating physician who had actually seen the patient in person. Id.

In light of Johnson, this Court must presume that an in-person examination and observation of Ramos-Birola was "important" and that the severity of Ramos-Birola's subjective symptoms was not readily evaluated on a cold record.  There is no evidence in the record that either Dr. Colb or Dr. Sandell conducted an in-person assessment of Ramos-Birola. See R. 329–36, 450–57.  Accordingly, on remand, the ALJ must also re-examine the weight it gave the assessments by Dr. Colb and Dr. Sandell as well.

### ii.  Weighing the Opinions if None Deserve Controlling Weight

If an opinion is entitled to controlling weight, the ALJ is required to adopt the opinion and the inquiry stops. SSR 96-2p, 1996 WL 374188, at *2.  If an opinion is not entitled to controlling weight, this does not mean it must be rejected.  Id. at *4.  Instead, the ALJ must weigh the opinion using the factors and sub-factors from 404.1527(d)(1–6) to decide whether it should be adopted. Id.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Id.  Even if the ALJ finds, upon remand, that Dr. Katz-Pollak's opinion is not entitled to controlling weight, then, the ALJ will still be required to reconsider whether Dr. Katz-Pollak's opinion is entitled to more weight than the opinions of the state agency physicians regarding the claimant's physical condition.   In undertaking this analysis, the ALJ will be required to reconsider her evaluations of these opinions in accordance with the legal standards above.

### 5.  Consideration of the Need for Work Absences

Ramos-Birola argues that the ALJ erred by not explicitly considering, as part of her RFC determination, Dr. Katz-Pollak's opinion that Ramos-Birola would need to be absent from work more than three times per month due to her impairments.  In support of this argument, Ramos-Birola correctly notes that an ALJ cannot ignore relevant evidence in the record. Pl. Mem. 13. However, as the First Circuit has said, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." N.L.R.B. v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999); see also Miller v. Astrue, No. 099-12018-RBC, 2011 WL 2462473, at *11 (D. Mass. Jun. 16, 2011) ("[t]here is no requirement that an ALJ discuss every bit of evidence in the record when penning his decision"). Indeed, "[t]he failure to mention a particular record does not evince a failure to consider it.  To

the contrary, the presumption is 'that the ALJ has considered all the evidence before him.'" Miller, 2011 WL 2462473 at *11 (quoting Quigley v. Barnhart, 224 F. Supp. 2d 357, 369 (D. Mass. 2002)).

Here, Ramos-Birola is right that the ALJ did not explicitly mention Dr. Katz-Pollak's opinion that the claimant would have to miss more than three days of work per month. See R. 15. However, it is clear that the ALJ considered Dr. Katz-Pollak's RFC opinion. R. 15. As a result, this Court may presume that the ALJ considered Dr. Katz-Pollak's opinion in its entirety, including Dr. Katz-Pollak's opinions about Ramos-Birola's expected absences. Therefore, when the ALJ determined that, "[i]n sum, Dr. Katz-Pollak's opinions are not consistent with the objective evidence," R. 15, this Court could reasonably conclude that she was speaking to all of the relevant evidence before her, including Dr. Katz-Pollak's opinion as to unexpected absences from work. Of course, for the reasons described above, the ALJ will be required upon remand to reconsider Dr. Katz-Pollak's opinion in its entirety, including the portion regarding absences from work.

### 6.   Mental Health Professionals' Evaluations of Physical Impairments

Ramos-Birola argues that the ALJ erred by not referring, at step two or in the RFC analysis, to the reports of Ramos-Birola's mental health professionals to assess her physical condition. In particular, Ramos-Birola argues that the ALJ should have referred to the medical assessments of Ramos-Birola's treating mental health sources to gauge the severity of Ramos-Birola's physical condition, because these assessments "repeatedly referred to the co-morbid nature of the claimant's physical condition and chronic pain symptoms in conjunction with her chronic depression and anxiety related disorders." Pl. Mem. 8 (citations to the record omitted).

However, while Dr. Green and Ms. De Jesus frequently referred to the effect of Ramos-Birola's physical impairments on her mental health, see, e.g., R. 558-59, 565-67, 576-82, they explicitly said, on their mental impairment questionnaire, that Ramos-Birola's mental impairments did not exacerbate Ramos-Birola's physical symptoms.  R. 582.  Therefore, the ALJ did not err by not referring to the medical assessments of Dr. Green and Ms. De Jesus in assessing the severity of Ramos-Birola's physical condition.

## V.    Conclusion

Because the ALJ did not consider Ramos-Birola's fibromyalgia to be a medically determinable impairment, she neither considered all the relevant evidence nor applied all the legal standards necessary to determine whether Ramos-Birola is disabled.  This Court therefore DENIES the Commissioner's motion, AFFIRMS Ramos-Birola's motion, and REMANDS this case for further findings and/or proceedings not inconsistent with this opinion.

Specifically, on remand, the ALJ must first determine at step two whether Ramos-Birola's impairments – including her fibromyalgia – constitute a severe impairment or combination of impairments.  Then the ALJ must first determine Ramos-Birola's RFC by considering her fibromyalgia, along with her other impairments, and assessing and weighing the medical opinions and Ramos-Birola's credibility regarding her physical condition, in light of the legal standards outlined above.  Having reassessed Ramos-Birola's RFC, and given the prior finding that Ramos-Birola cannot perform her past relevant work,  the ALJ must proceed to step five of the disability evaluation process and determine whether work exists in the national economy that Ramos-Birola can perform.  If, upon reevaluation of the testimony of the VE at the July 26, 2010 hearing, the ALJ determines that the prior VE testimony addressed hypothetical questions that include all of the limitations supported by the record and the appropriate

vocational factors, then the ALJ can make her step-five finding with reference to the testimony already on record.  However, if in light of her reassessment on remand, the ALJ determines that the VE did not address the proper hypothetical questions, the ALJ must obtain and consider vocational expert testimony that addresses the proper questions.

**So ordered.**

<u>/s Denise J. Casper</u>
Denise J. Casper
U.S. District Judge